J. H. MARTER, ADMR., *v.* CATHEY-WILLIFORD-JONES LUMBER Co., et al.

No. 39727        October 17, 1955        82 So. 2d 724

*Smallwood, Sumners & Hickman,* Oxford; *Leon Provine,* Grenada, for appellant.

*Watkins & Eager, Shelby Rogers,* Jackson, for appel-
lee.

ROBERDS, P. J.

This proceeding involves a claim under the Mississippi Workmen's Compensation Law. Chap. 354, General Laws of Miss. 1948, as amended by Chap. 412, General Laws of Mississippi 1950.

On the afternoon of March 23, 1951, Cecil Marter suffered serious injuries while unloading logs from a truck onto the mill and lumber yards of Cathey-Williford-Jones Lumber Company at Grenada, Mississippi. Marter died from those injuries April 3, 1951. We will call Cathey-Williford-Jones Lumber Company the Lumber Company in this opinion.

On April 30, 1951, Mrs. Willie S. Marter, the widow of Cecil Marter, and Jack Clark had an agreement under which Clark was to pay the hospital bill of $555.25 and funeral expenses of $200.00, and Mrs. Marter agreed to release Clark from liability for the death of Cecil Marter. Clark did pay Mrs. Marter $100.00. He also paid part of the hospital bill but at the beginning of the hearing of this matter before the attorney-referee on April 14, 1953, he yet owed $225.25 on that bill.

The Administrator of the Estate of Cecil Marter, after the foregoing alleged settlement, filed this claim against the Lumber Company and its insurance carrier for the benefit of the widow and dependent children of Cecil Marter. He asserted that the Lumber Company and its carrier were liable on the grounds, first, that Marter was an employee of the Lumber Company when injured, but if mistaken as to that, then Clark was a sub-contractor under the Lumber Company, employing eight or more employees, and that Clark carried no compensation insurance and that therefore the Lumber Company was liable to claimants under Chap. 412, General Laws of Mississippi 1950, Sec. 3 (4) p. 494. The Lumber Company and its carrier took issue on both contentions.

The attorney-referee found that Clark was an independent contractor; that Marter was his employee; that Clark did not have eight employees when the accident happened, and that, therefore, the Lumber Company and its carrier were not liable to Marter's widow and dependent children. The Commission confirmed the findings and conclusions of the attorney-referee. The learned trial judge expressed grave doubts as to those findings and conclusions but finally affirmed the action of the Commission prompted by the impression that the facts of this case were sufficiently similar to those in Simmons v. Cathey-Williford-Jones Lumber Company, 220 Miss. 389, 70 So. 2d 847, to bring this case within the results reached in the Simmons case, and he reluctantly affirmed the action of the attorn-

ey-referee and the Commission. From that judgment the Administrator appeals here.

██ ██ We do not deal with the number of employees of Clark, or whether the provisions of Chap. 412, General Laws of Mississippi 1950, Sec. 3 (4) at p. 494, are applicable as between the Lumber Company and Clark, under the facts of this case, for the reason we have concluded, after diligent study of this record, that under the peculiar situation here involved, Clark was not an independent contractor, and we think the Lumber Company is liable to the widow and dependent children of Cecil Marter under the Workmen's Compensation Act.

There is little dispute as to the ultimate controlling facts of this case. The problem is mainly one of law—reaching the correct conclusion from the facts. We will endeavor to state those facts as they appear from the record.

In 1944, and before that time, the Lumber Company was the owner and operator of a large lumber yard and sawmill at Grenada, Mississippi. It owned extensive tracts of timber. It cut in the woods and hauled to the sawmill its own timber, employing and paying all labor, and furnishing all machinery, tools and equipment, tents and camp houses, for that purpose. One of its employees was Cecil Marter. He performed some services in the woods but mainly he was a millwright about the mill. Jack Clark and one Liles were also employees. They were woods foremen. They supervised in the woods the cutting, loading and transportation of logs to the mill-yards. In 1948 the plant, as we will call the lumber and mill-yard, burned. In 1949 it was rebuilt. In the meantime the Workmen's Compensation Law had been enacted and approved April 13, 1948, and it went into effect January 1, 1949. Chap. 354, General Laws of Mississippi 1948. The Lumber Company says that upon the rebuilding of its plant it had decided, for economical reasons, to cease cutting and hauling its own timber, and that it would be best to let this work by contract. Claimants

insist the Lumber Company adopted that change of policy because of enactment of the Workmen's Compensation Law. In any event, during the year 1949, Jack Clark and one Liles orally agreed to and did form a partnership for the purpose of felling, cutting into logs and transporting those logs to the plant of the Lumber Company. The Lumber Company agreed to pay them a named sum per thousand feet for the logs when delivered at the plant. The Lumber Company appears to have furnished to Clark and Liles all machinery, equipment, appliances and tools for the doing of this work. It is contended that this was a rental arrangement, but it is not shown what rental was paid. There is in evidence that the Lumber Company would credit Clark and Liles one or two dollars per thousand feet delivered on the yards. The Lumber Company advanced the necessary money for the foregoing operations. Clark and Liles took out workmen's compensation insurance. This was obtained for them through, and the premiums thereon paid by, the Lumber Company, charging the premiums to Clark and Liles. We do not detail this arrangement further because the relation between the Lumber Company and Clark and Liles as a partnership is not here involved except as they may throw light and bear upon the facts and circumstances existing later between Clark and the Lumber Company. This Clark-Liles partnership arrangement lasted some three or four months, when it was dissolved and Liles disappears from the picture. It is in evidence that the main reason for the dissolution of the partnership was to reduce the number of employees of Clark and Liles below eight so that compensation insurance would not have to be carried by them.

After Liles left, Clark made some kind of an arrangement with the Lumber Company for cutting and transporting logs to the plant. It is in evidence that the first contract was in writing. However, the contract was not produced and not introduced in evidence. A sample contract was offered but the attorney-referee excluded it and,

therefore, it is not before us. It is admitted that all subsequent agreements between the Lumber Company and Clark were oral. Anyway, Clark says he continued to cut and haul the logs to the plant; that the Lumber Company was to pay him so much per thousand feet for the logs delivered on the yards. This is the way the operations were carried on:

The Lumber Company furnished Clark with all of the machinery and equipment and tools used in the cutting and transportation of the logs, except one Ford truck. This was the machinery, equipment, tools, etc., which the Lumber Company had used in that work while it was cutting and transporting its own logs. It consisted, in part, at least, of two large caterpillar tractors, a large trailer, a Ford truck, all needed logging equipment, tools, etc. Clark also quartered his labor in camp houses owned by the Lumber Company, and located upon, or near, the land from which the timber was being cut and removed. The Lumber Company also owned certain camping tents, equipped with furniture and cooking utilities needed for occupancy of such tents as living quarters. These were used by Clark. The witnesses say the first arrangement with Clark about all of this machinery, equipment, tools, etc., was that he was to be charged one or two dollars per week for its rental, this to be deducted from what the Lumber Company owed him for delivered logs. Just what amount was charged, or paid, as rental is not shown. However, as we understand the record, there was no claim that a rental charge was being made for the use of the camp houses and tents and their furnishings. During this supposed rental period, the Lumber Company advanced to Clark needed money with which to meet the payroll, for operation of and repairs to the machinery and equipment, and also for groceries for the laborers. This supposed rental arrangement lasted some three or four months. Then it is contended by the Lumber Company and its carrier that the Lumber Company and Clark had an oral understanding that the Lumber Company

would sell to Clark the logging machinery, tools and equipment. We do not understand it is claimed this arrangement covered the camp houses and camping tents owned by the Lumber Company and used by Clark. We have neglected to state that the Lumber Company owned what is called a "logger's dream." This appears to be a very valuable piece of machinery, especially efficient in the placing of logs onto vehicles for transportation. It is not claimed that the "logger's dream" was to be rented to or purchased by Clark, but he used it in all of his logging operations. Under this purchase agreement, Clark was to be charged weekly by the Lumber Company one or two dollars per thousand feet as delivered by Clark to the plant. We do not find proof of payment by Clark or credit to him of any definite amount as payment upon said machinery and equipment. The Lumber Company appears to have furnished all, or, at least, the larger part, of the money necessary to purchase gasoline and oil and keep the machinery and equipment in repair, and to purchase groceries and supplies for the workmen. No interest was charged for such advances. This was also to be charged to Clark on the books of the Lumber Company but proof of the charges for the different items is very definite.

The Lumber Company had a bookkeeper by the name of Pepper, who had been an employee of the Lumber Company for a number of years. Pepper testified that Clark made some kind of a nebulous arrangement with him under which he was to keep the books of Clark. This work was done in the office of the Lumber Company. He said Clark agreed to pay him ten dollars per week but that "some weeks, sometimes he didn't give me anything." The labor was usually paid off at the Lumber Company's office but sometimes they were paid in the woods. Pepper also testified that during the period of these operations by Clark, and until the operations ceased in February 1952, Clark was never out of debt to the Lumber Company.

Clark said he had the right to hire, fire and fix the compensation of the laborers. However, it is shown that he employed Marter at the request of Reed, manager of the Lumber Company. And Clark testified "I took the crew they had." On the question of the right to control the workmen cutting and hauling these logs, Reed gave this testimony: Q. "And when he was out there he handled the men, all you did was to tell him the size and where the lumber was?" A. "Supervise his part of it." Q. "As far as your supervision, it was the same whether he was foreman or contractor, wasn't it?" A. "Practically the same." Reed and Clark also said the arrangement could be terminated at any time by either party. It seems certain that Clark had no contract to cut the timber from any specifically described tract of land. Reed gave this testimony: Q. "You checked where he was cutting each time to see that your timber was cut, and you told him where to go to cut timber, didn't you?" A. "Yes, sir, told him the timber and showed him the land lines." Q. "Showed him the tracts and the land lines, and he only cut timber where you sent him?" A. "That's right."

During the period from the date of dissolution of the Liles-Clark partnership until after the injury, Clark carried no compensation insurance. After that accident, the Lumber Company insisted on Clark obtaining such insurance. Clark could not obtain the insurance. The Lumber Company, three days after the death of Marter, through its own facilities, did obtain that insurance. It paid the premium and charged that to Clark. To secure the premium paid by the Lumber Company, and to cover other indebtedness owing it by Clark, and for its own protection, the Lumber Company, on May 19, 1951, took a deed of trust from Clark upon one caterpillar tractor, one Ford Tractor and one trailer to secure the sum of $4,624.31.

On February 20, 1952, the arrangement between the Lumber Company and Clark was terminated. Under this

the Lumber Company took back its machinery and equipment. According to a purported bill of sale that consisted of two caterpillar tractors, one Ford truck and one Nabors Trailer "Together with all miscellaneous logging equipment." The purported bill of sale did not include the "logger's dream", nor the camp houses, tents, etc. Pepper said the various debits and credits were figured up and the Lumber Company determined it owed Clark $2,000.00 and he was paid this sum. Clark said he accepted and was paid this sum but did not understand just how the amount of his indebtedness was ascertained. That was done by the Lumber Company. As to the machinery, equipment, etc., Reed testified that when Clark went into the arrangement he had only one truck and when the arrangement was terminated Clark had one truck.

We now list the Mississippi cases which we think most helpful in trying to solve the question here involved: Kisner v. Jackson, 159 Miss. 424; Regan v. Foxsworth Veneer Company, 178 Miss. 654, 174 So. 48; Carr v. Crabtree, 212 Miss. 656, 55 So. 2d. 408; Sones v. Southern Lumber Co., 215 Miss. 148, 60 So. 2d. 582; Simmons v. Cathey-Williford-Jones Co., 220 Miss. 389, 70 So. 2d. 847, and Bardwell's Estate v. Perry Timber Co., 222 Miss. 854, 77 So. 2d. 708.

We do not restate the rules announced in those cases on the question of independent contractor. They can be gathered from reading the cases. We think the Sones case is nearest in point to the case at bar. We here set out the facts of that case as found by the Court: "Gipson owned and operated a sawmill in Pearl River County and, having in his employment more than eight persons, qualified under the Workmen's Compensation Act, Code 1942, Sec. 6998-01 et seq. About half of his supply of logs came from timber which he owned and the remainder came from purchases of logs from outside parties who brought them to the mill for sale. Gipson had one Walter Johnson in his employment as manager of a farm owned

by Gipson and, in addition to the farm duties, Johnson
was for some time employed as woods foreman in cutting
and hauling logs to the mill from timber owned by Gipson.
In doing this work Gipson furnished a truck for the
hauling and also furnished a machine known as a ''log-
ger's dream'' which was used in skidding the logs from
the forest and in loading them upon the truck. He also
furnished the other equipment used in the logging opera-
tions. A few months prior to appellant's injury Gipson
entered into an oral contract with Johnson whereby Gip-
son furnished the above mentioned equipment to Johnson,
agreed to keep the same in repair, agreed to furnish all
the gasoline and oil necessary for the operation thereof,
and agreed to pay Johnson $13 per thousand feet for logs
delivered at the mill. No notice of this change was posted
at the mill or in any other manner given to the employees.
The logs were to be cut from timber owned by Gipson,
and Johnson was to employ and pay the men who assisted
in cutting and hauling the logs. Johnson himself worked
along with these men. Gipson testified that this oral
contract did not cover any specific tract or amount of
timber, did not expire at any fixed time, and that either
he or Johnson had the right to terminate the agreement
at any time without notice. Gipson went upon the land
from which the timber was to be cut and pointed out
the lines. He also directed that the cutting be confined
to those trees which measured nine inches and over in
diameter at a point ten inches above the ground. All
the logs therefrom were to be delivered to his mill.''

The claim in that case was denied by the attorney-
referee, the Commission and the trial judge just as was
done in this case. We reversed those findings and gave
judgment here. In our view the case at bar is stronger
against the independent contractor contention than is
the Sones case. It is not conceived how Clark could have
been independent of the Lumber Company under the facts
of this case. ▆▆ Independence means independence in
right and in fact. The facts in Simmons v. Cathey-Willi-

ford-Jones Co., supra., are quite different in a number of material respects from the facts in the case at bar.

■■■ We are reluctant to reverse the findings and conclusions of the attorney-referee, the Commission and the trial judge, but where it is clear, as it is here, that the defense of independent contractor is a mere pretense, it is our duty to do so.

It will be necessary for the Commission to determine who are dependents of Cecil Marter and the amounts due each, as well as the amount due the widow.

Reversed and remanded.

*Lee, Kyle, Ethridge* and *Gillespie, JJ.*, concur.